**The PEOPLE of the State of Colorado, Complainant**

**v.**

**John Frederic HEAD, Respondent.**

**No. 13PDJ016.**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

July 31, 2013.

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)**

### I. *SUMMARY*

In 2008, Respondent was ordered to pay approximately $36,000.00 in attorney's fees after a court dismissed claims he brought on behalf of clients under the Colorado Consumer Protection Act. The same year, the defendants in that action initiated auxiliary proceedings under C.R.C.P. 69 and 103 asking the court to enforce its order. Respondent hampered and delayed the collection proceedings, made false statements to the trial court and opposing counsel about the existence of his 2006 and 2007 tax returns, and failed to comply with court orders. Through this conduct, Respondent violated Colo. RPC 3.4(a), 3.4(c), 8.4(c), and 8.4(d); however, the Hearing Board cannot find that the People have proved all the elements of Colo. RPC 3.3(a)(1), 3.3(a)(3), or 4.1(a). The Hearing Board concludes that the appropriate sanction is suspension for one year and one day.

---

1. Stipulated exhibit 1 contains subparts numbered 1.001 through 1.176.

2. *See Vikman v. Int'l Bhd. of Elec. Workers, Local Union No. 1269,* 889 P.2d 646, 654 (Colo.1995).

### II. *PROCEDURAL HISTORY*

The People filed a complaint in this case on January 30, 2013. Respondent answered on February 25, 2013. During an at-issue conference on March 15, 2013, the PDJ set the disciplinary hearing for June 4 and 5, 2013. On May 23, 2013, Respondent moved to continue the hearing, citing as grounds the press of business, conflicts in scheduling, and inconvenience. The PDJ denied that request the next day, finding Respondent failed to establish good cause for continuing the hearing.

During the disciplinary hearing, the Hearing Board heard testimony from Respondent, Norman B. Beecher, and Judge John L. Wheeler and considered stipulated exhibits 1–20 [1] and Respondent's exhibits A–K. After the close of the People's evidence, Respondent moved for a directed verdict, and the PDJ deferred ruling on the motion. In viewing the evidence in the light most favorable to the People,[2] the PDJ **DENIES** Respondent's motion for a directed verdict.

### III. *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on September 27, 1972, under attorney registration number 03077.[3] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[4]

#### Factual Background

Respondent is a solo practitioner and the sole shareholder of Head and Associates, P.C. ("H & A"), a firm that specializes in complex civil litigation. Respondent frequently advances H & A money for expenses and subsequently receives reimbursements from the firm. In the late 1990s, H & A settled a Ponzi-scheme class action lawsuit

---

3. Respondent's registered business address is 1860 Blake Street, Suite 300, Denver, Colorado 80202–3512.

4. *See* C.R.C.P. 251.1(b).

and received around $2.5 million, before taxes, in attorney's fees. Acting on the advice of Respondent's accountant, H & A kept these attorney's fees as retained earnings, which were payable to Respondent.[5] As H & A's sole shareholder, Respondent alone had the authority to direct H & A to make distributions of the retained earnings. Beginning in 2005, Respondent decided not to draw a salary from H & A and instead chose to receive distributions of retained earnings, which were not subject to additional income taxes.

In 2005, Arden and Andrea Dennis retained Respondent to bring a civil action on their behalf in Arapahoe County District Court.[6] In the lawsuit, Respondent alleged that an agreement involving a sale and lease-back option of the Dennises' residence violated the Colorado Consumer Protection Act. The defendants were represented by Norman B. Beecher.

By November 10, 2007, the court had dismissed all of the Dennises' claims,[7] and on April 14, 2008, it ruled that Respondent and his clients were jointly and severally liable for the defendants' $36,830.00 in attorney's fees.[8] This order was reduced to a judgment on June 11, 2008, for the original amount plus statutory interest dating from April 14, 2008.[9]

Respondent testified that around this time, his firm was working on a few cases that did not "go well," and he was facing multiple financial obligations, including a debt of more than $200,000.00 to a friend. He characterized H & A as "starved for money," making it difficult to establish a payment plan for the attorney's fee judgment. He testified that despite these debts he was committed to paying the judgment. From June through October 2008, H & A owed Respondent about $200,000.00 in retained earnings.[10] From June to July 2008, H & A paid Respondent approximately $4,000.00,[11] and Respondent testified that he used these disbursements to pay his living expenses. In July 2008, H & A's operating account ran a balance of around $4,000.00,[12] although Respondent did not direct H & A to pay any part of the judgment with the balance because that money "kept the firm running."

Shortly after entry of the judgment, the defendants initiated collection proceedings against Respondent and H & A under C.R.C.P. 69.[13] Judge John L. Wheeler presided over these proceedings. On June 19, 2008, Respondent was served with C.R.C.P. 69 interrogatories.[14] Respondent was asked to list how much he was paid, when he was paid, and by whom he was paid.[15] He was also asked to identify any persons, firms, or corporations that owed him money.[16] His responses were due within twenty days.[17]

Having received no response by July 14, 2008, the defendants moved for a finding of contempt and to compel Respondent to answer,[18] indicating that they had contacted Respondent several times but never received

5. *See* Ex. 10.

6. The case was styled *Arden G. Dennis v. Joseph Heffley,* case number 2005CV1944.

7. *See* Compl. ¶¶ 4–8; Answer ¶¶ 4–8.

8. *See* Exs. 1.001 & 1.002.

9. Ex. 1.005.

10. Ex. 10 at 1660. ·

11. Ex. 10 at 1660; Ex. 19 at 1765.

12. Ex. 19 at 1763.

13. The People did not present any evidence indicating that the defendants initiated collection efforts against the Dennises.

14. Exs. 1.006 & 1.007. C.R.C.P. 69 governs post-judgment execution and proceedings. A judgment creditor (here, the defendants) can use the discovery procedures set forth in C.R.C.P. 69 to obtain information about assets belonging to the judgment debtor (here, Respondent) that might be subject to execution or garnishment. *See* C.R.C.P. 69(d). Beecher testified that he relies on responses to C.R.C.P. 69 interrogatories to determine whether income can be garnished or property attached.

15. Ex. 1.007 at 0322, Interrog. No. 7.

16. Ex. 1.007 at 0325, Interrog. No. 24.

17. Ex. 1.007 at 0321; C.R.C.P. 69(d).

18. Exs. 1.009 & 1.010.

his responses.[19] On July 22, 2008, the court granted the motion to compel, ordering Respondent to answer within twenty days.[20]

By July 24, 2008, Respondent had not made any payments toward the judgment, leading the defendants to serve two writs under C.R.C.P. 103: a writ of continuing garnishment on Respondent ("personal writ") and a writ of garnishment with notice of exemption and pending levy upon H & A ("H & A writ").[21] These writs would permit the defendants to garnish up to twenty-five percent of Respondent's income and to attach H & A's assets. The H & A writ directed Respondent, on behalf of H & A, to describe the nature and amount of the firm's debts and obligations.[22] It also ordered H & A to "hold pending court order any personal property (other than earnings) owed to or owned by the Judgment Debtor and in your possession or control on the date and time this Writ was served upon you." [23] When the writs were served, H & A's operating account contained approximately $800.00.[24] Respondent's responses to the two writs were due ten days after service.[25]

As of August 29, 2008, Respondent still had made no payments to the defendants to satisfy the debt. On that same day, Respondent answered both writs.[26] He answered the personal writ by stating that H & A would not pay him any wages during the period of garnishment.[27] He answered the H & A writ by stating that the firm owed him "retained earnings." [28] He did not, however, describe the amount of the debt, as required by the writ, nor did he claim any exemptions.[29] He testified that he must have "overlooked" this. Despite these answers, H & A's business records indicated that by August 29, 2008, the firm had approximately $204,000.00 in retained earnings payable to Respondent, and it had recently paid him $3,150.00.[30]

Meanwhile, the defendants filed a second motion to compel and for a finding of contempt on August 22, 2008, asserting Respondent had yet to respond to the interrogatories.[31] The court granted this motion and set a show cause hearing for October 2, 2008.[32] Respondent did not appear for this hearing, and it was reset for November 25, 2008.[33] Beecher testified at the disciplinary hearing that he first learned at the October show cause hearing that Respondent had filed his interrogatory responses in person on July 15,

19. Ex. 1.009 at 0332.

20. Ex. 1.011.

21. Exs. 1.012 & 1.014. C.R.C.P. 103 governs the procedure for withholding a judgment debtor's earnings to satisfy a debt. These writs were issued on behalf of the court, and Respondent testified that he understood the writs to be court orders. *See also* Ex. 1.048 at 0544 ("This Writ with Notice is a Court order which may cause your property or money to be held and taken to pay a judgment entered against you. You have legal rights which may prevent all or part of your money or property from being taken. That part of the money or property which may not be taken is called 'exempt property.' "). Respondent had ten days to file a claim of exemption. Ex. 1.048 at 0545.

22. Ex. 1.014 at 0380.

23. Ex. 1.048 at 0543.

24. Ex. 19 at 1764.

25. Ex. 1.014 at 0379, 0381.

26. Ex. 1.049 at 0563–64; Ex. 1.048.

27. Ex. 1.049 at 0563–64.

28. Ex. 1.048 at 0544. Respondent testified that he viewed the retained earnings as a standing obligation not due or payable unless there was money in H & A's operating account.

29. Ex. 1.048 at 0544.

30. Ex. 10 at 1660. Respondent testified that he believes the defendants would only have had access to money H & A owed him at the time the writ of garnishment was served. Respondent explained that in some instances H & A paid him cash because he had advanced the firm money from his personal funds, and he interpreted the relevant case law as holding that reimbursement of expenses is not considered a "true distribution" subject to garnishment.

31. Ex. 1.021; *see also* Ex. 1.011.

32. Exs. 1.022, 1.024 & 1.037.

33. Ex. 12. The court's clerk mistakenly told Respondent that the hearing had been vacated. Ex. 12 at 0205:10–17.

2008.[34] Respondent never filed these responses electronically with the court, although they were eventually entered into the court's electronic filing system on November 25, 2008.[35] Beecher recalled that when he filed the motion to compel, he was in communication with Respondent. Nevertheless, Respondent never informed Beecher, the defendants, or the court that he had already filed his responses, even though his failure to respond had been the subject of motions to compel, hearings, and court orders.

In his interrogatory responses, Respondent stated that he was employed and paid by H & A; however, he claimed that the amount and timing of his payments "varie[d]."[36] He also acknowledged that H & A owed him money but did not specify why or how much.[37] H & A's business records show that $208,982.00 in retained earnings were payable to Respondent as of July 15, 2008.[38]

The defendants served Respondent with a *subpoena duces tecum* on November 12, 2008, directing him to bring to the upcoming show cause hearing his personal and corporate tax returns and related records for the prior three years.[39] Respondent did not, however, bring all the documents to the hearing on November 25, 2008.[40] Instead, he informed the court that "there [were] documents [ ] in storage someplace," and that he "brought what [he] could find."[41] At the conclusion of the hearing, the court ordered Respondent to supplement his interrogatories with responsive answers[42] and permitted the defendants to take Respondent's deposition pursuant to C.R.C.P. 69.[43]

Respondent filed his supplemental responses to the interrogatories on December 12, 2008, adding he was "not paid on a regular basis" and was only paid "when there [were] sufficient gross revenues which exceed[ed] expenses. Any such payments of income depend[ed] upon the settlement of large contingent fee cases."[44] Beecher testified that he was frustrated by this "barebones" and "evasive" response. Although H & A paid Respondent a total of $950.00 between November 20, 2008, and December 5, 2008,[45] as well as $200.00 on December 12, 2008,[46] he defended his supplemental answers, saying these were ordinary income payments that the defendants would not care about.

Respondent was deposed on December 18, 2008.[47] Although he was still subject to the *subpoena duces tecum* issued on November 12, 2008,[48] he again failed to bring the documents named in that subpoena to his deposition. When Beecher asked him where the subpoenaed documents were located, he responded that he had searched but had not found them,[49] and that his personal and corporate tax returns were "in a box someplace that [he hadn't] been able to locate yet."[50]

When Beecher asked whether he had filed his 2007 tax returns, Respondent said he had

---

34. C.R.C.P. 69(d) required Respondent to appear before the court clerk to sign the interrogatory responses under oath and file them. Beecher understood that Respondent's failure to also electronically file the interrogatory responses contravened the electronic filing requirements governing this case.

35. Ex. 1.041 at 0516.

36. Ex. 1.041 at 0517, Resp. to Interrog. No. 7.

37. Ex. 1.041 at 0520, Resp. to Interrog. No. 24. Respondent testified that this statement referred to the retained earnings.

38. Ex. 10 at 1660.

39. Ex. 1.039 at 0507.

40. Ex. 13 at 0223:17–25–0224:1–7.

41. *See* Ex. 13 at 0223:9–25–0224:1–2.

42. Ex. 13 at 0222:10–23; 0224:11–0225:6.

43. Ex. 1.044.

44. Ex. 1.045. Respondent stands by this factual assertion. He testified that he believes there is well-settled law establishing that a contingent liability is not subject to garnishment.

45. Ex. 10 at 1660.

46. Ex. 19 at 1792.

47. *See* Ex. 14.

48. Ex. 14 at 0060:1–9.

49. Ex. 14 at 0060:6–9.

50. Ex. 14 at 0060:11–15.

not, but he had received an extension to file them.[51] As for his 2006 tax returns, the following dialogue took place:

Q. And what is—how much income did you show on your tax return in 2006?

A. I think that that was $60,000.

Q. Is that one of the ones you are looking for?

A. No.

Q. Do you have that?

A. Huh-uh. No. What do you mean do I have it?

Q. The 2006 tax return.

A. What did you ask for?

Q. Do you have the 2006—the year 2006 tax return?

A. Well, that particular tax return would be in the box that I am looking for, and I don't know whether you requested that or not.

Q. Where is the box that you can't find?

A. It's either in storage out on—a storage facility on Arapahoe Road, or it's in the basement of the office where I office now. . . . [52]

The evidence shows that Respondent did not actually prepare and file his personal or corporate 2006–2007 tax returns until March 2010.[53] Yet Respondent testified at the disciplinary hearing that his statements at the deposition were true, reasoning that, as he told Beecher, he was in fact looking for his 2006 returns. He admitted, however, that perhaps he could be faulted for saying his 2006 returns were in a box, since he realized upon finding the box that he had not filed those returns.

When questioned at the December 2008 deposition whether anyone owed him or H & A money, Respondent replied that "nobody owe[d][him] any money personally"[54] and that there was nothing for the defendants to "attach."[55] In fact, on that very day H & A paid him $50.00[56] and had $196,657.00 in retained earnings payable to him.[57] Beecher testified that he relied on Respondent's statements, even though it seemed incredible that H & A did not owe Respondent money, because he had received no contrary information.

At the end of the deposition, Respondent again agreed to produce the documents Beecher had subpoenaed, including his personal and corporate tax returns.[58] Respondent testified that he fulfilled his obligations shortly after his deposition,[59] but Beecher disagreed, stating that Respondent repeatedly gave him incomplete records.

The defendants moved for default on April 14, 2009,[60] seeking an order requiring Respondent to pay the judgment plus additional interest into the court registry.[61] The court

51. Ex. 14 at 0073:16–19.

52. Ex. 14 at 0074:10–24–0075:1–5.

53. *See* Ex. 2. Respondent remembered looking for the subpoenaed tax returns and documents in 2008 and again more rigorously in 2009, eventually locating some financial records in 2010 in a box that contained client research.

54. Ex. 14 at 0081:5–11. At the disciplinary hearing, Respondent reaffirmed his view that at the time of his deposition, H & A did not "owe" him money.

55. Ex. 14 at 0070:7–10.

56. Ex. 19 at 1792. At the hearing, Respondent admitted the defendants could have attached $50.00.

57. Ex. 10 at 1660.

58. Ex. 14 at 0116:1–24.

59. *See* Ex. A (listing documents). Respondent also stated that he gave Beecher additional documents in July and August 2009, *see* exhibits B and C (listing documents), and again in July 2010, *see* exhibit D (enclosing 2009 profit and loss statement).

60. Ex. 1.047. Beecher stated that he continued to pursue remedies through the court because he did not believe Respondent or H & A lacked assets and because he had not received Respondent's answers to the writs.

61. Ex. 1.047. Respondent argues that the defendants erred by moving for contempt pursuant to C.R.C.P. 107, ¶2(g) rather than C.R.C.P. 103, and the court's order was therefore insufficient as a matter of law. Beecher admitted at the hearing that this motion contained typographical errors. Instead of requesting judgment pursuant to C.R.C.P. 103 § 2(g), he mistakenly cited "C.R.C.P. 107, ¶2(g)." Ex. 1.047 at 0538–39. Although there is no paragraph 2(g) in C.R.C.P. 107 and the substance of the motion referred to

granted the motion on May 22, 2009.[62] However, Respondent did not make any payments to the court registry because, he explained, he did not "have the cash to pay" the judgment.

A hearing was set for June 25, 2009, to address the defendants' newest contempt motion, which they filed on April 15, 2009.[63] H & A's operating account received $41,000.00 in deposits around this time, but Respondent still had made no payments to the court registry.[64] H & A's retained earnings amounted to around $185,000.00,[65] and it paid him $5,000.00 on June 27, 2009.[66] Respondent admits he used this money to pay his own living expenses and H & A's operating expenses rather than the judgment.[67]

At the contempt hearing, the court addressed Respondent's continued failure to produce his personal and corporate tax returns and to answer the interrogatories.[68] Respondent explained to the court that he was still unable to find the subpoenaed tax returns, once again asserting that he could not find them "because there's boxes of documents that … they're in that [he could not] find," [69] assuring the court that the returns were "all filed in the same storage location." [70] He implied that Beecher could obtain the returns from the IRS because Respondent had signed releases,[71] stating:

> I have no problem getting the tax returns, but I—I gave [Beecher] what I have. And I gave him the power, the authority, to get

from the IRS what—what it is that's been filed that I don't have.[72]

At the time Respondent made these statements, he had not filed the personal or corporate tax returns in question.[73] Beecher testified that based on these statements and Respondent's prior representations that the returns were in storage, he believed the tax returns existed. He thus continued to seek them.

The following discussion about Respondent's tax preparer also took place during the contempt hearing:

> [Court]: Who prepares your taxes, though?
>
> [Respondent]: The accountant, Mark—now that you ask me, I forgot his name, Mark somebody.[74]
>
> . . .
>
> [Court]: Mr. Head, you're—you're going to be ordered by the Court to provide the name, address, and phone number of your tax accountant, Mark whoever he is.
>
> [Respondent]: Le[h]rner. Le[h]rner. I just remembered, Le[h]rner.
>
> [Court]: Mr. Le[h]rner. Again, in writing to Mr. Beecher, name, address, phone number of Mr. Le[h]rner, and I am going to permit Mr. Beecher to file a *subpoena duces tecum* on Mr. Le[h]rner for all records he has regarding—I don't know if you—does he do your personal returns as well?

---

garnishments under C.R.C.P. 103, Respondent steadfastly maintained at the hearing that he was entitled to rely upon the typographical error and that C.R.C.P. 107 does not permit remedial sanctions. He did not, however, appeal the court's order.

**62.** Ex. 1.056. Defendants asked the court to deem H & A's retained earnings as an amount sufficient to satisfy the judgment, even though the exact amount of those earnings was not specified. Ex. 1.056 at 0735.

**63.** Ex. 1.057.

**64.** Ex. 19 at 1825.

**65.** Ex. 10 at 1661.

**66.** Ex. 10 at 1661.

**67.** Throughout 2009, Respondent directed H & A to pay him periodic disbursements. *See* Ex. 10

at 1660–62. Respondent testified that he did not use any of these disbursements to pay the defendants because he needed to keep his firm running. Despite this purported inability to pay, he never moved for reconsideration of the court's judgment.

**68.** Ex. 15 at 0152:19–25; 0154:12–21.

**69.** Ex. 15 at 0154:25–0155:1–6.

**70.** Ex. 15 at 0157:2–6.

**71.** Ex. 15 at 0155:7–11.

**72.** Ex. 15 at 0155:16–19.

**73.** *See* Ex. 2.

**74.** Ex. 15 at 0164:19–21.

[Respondent]: Yes.

[Court]: Personal and corporate returns. That may kill two birds here. Both by getting copies [ ] of the tax returns [ ], personal and corporate, and any corporate documents.[75]

The court then instructed Respondent to sign releases permitting Lehrner and the IRS to produce Respondent's 2006–2008 tax returns.[76] Respondent testified at the disciplinary hearing that he signed these releases because the court ordered him to, even though he was uncertain at that point whether he had filed the 2006 tax returns and he had not filed his 2007 and 2008 returns.[77] Nevertheless, he did not notify the court that he had yet to file his taxes, instead giving the court the misimpression that the tax returns had been completed but were simply misplaced.

A few weeks later, after subpoenaing Lehrner, Beecher learned that Lehrner had not prepared Respondent's taxes since 2001. Beecher emailed Respondent on July 18, 2009, demanding an explanation.[78] Respondent responded by email, maintaining the tax returns existed:

As to Mark Lehrner, he has done my taxes in the past. There were several years when I prepared the returns myself.... I am going back through my stored files, box by box, as I know those tax returns are there someplace. It is possible that they are lost, but I don't think so.[79]

The defendants again requested sanctions against Respondent on July 24, 2009,[80] and the court held another hearing on August 19, 2009,[81] to inquire about the previously subpoenaed tax returns. Respondent continued to assert that they were in storage someplace but that he needed additional time to search through hundreds of boxes.[82] He now reasons that if he had discovered the taxes had not been filed, he would have completed the tax returns using the missing records and then produced them to the defendants. He did not explain this logic to the court, however.

At the hearing, the court also revisited the issue of who prepared Respondent's taxes:

[Court]: Mr. Head, did you do your own tax returns, both personally and for your company from—for 2006, '07, and '08 or did you have a tax preparer for those years?

[Respondent]: Your Honor, the—those—I'm not—for 2008, they're not done. 2006 and '07—they would have—I did them myself.[83]

He testified here that this statement to the court was accurate in the sense that he eventually did complete the returns himself but not "literally" accurate because the returns had not been done at the time he made the statement. Respondent then explained he did not know when Lehrner had last filed his taxes.

When asked about his 2006 and 2007 returns, Respondent replied that the returns "should all be in one box, I can't find them."[84] Beecher testified at the disciplinary hearing that as of August 2009, he still believed the subpoenaed tax returns resided in a box somewhere. Judge Wheeler also

---

75. Ex. 15 at 0165:6–20.

76. Ex. 15 at 0160:7–19. Respondent was also ordered to produce all of the records listed on the *subpoena duces tecum*. Ex. 1.061 at 0766–67. Finally, the court ordered Respondent to pay the defendants' fees associated with the motion to compel. Ex. 1.061 at 0767. Respondent now asserts that the court's written order was inconsistent with its rulings from the bench the previous day. The Hearing Board does not have the authority to determine the validity of a trial court's order, however. If Respondent wished to challenge the court's order, he should have exercised his right to appeal or moved for reconsideration.

77. Respondent testified that although he told Beecher in his December 2008 deposition that his 2007 tax returns had not been filed, he neglected to notify the court of this fact.

78. *See* Ex. 18.

79. Ex. 18 at 1751.

80. Ex. 1.070.

81. Ex. 16.

82. Ex. 16 at 0129:7–25–0130:1–7.

83. Ex. 16 at 0127:25–0128:1–5.

84. Ex. 16 at 0129:3–16.

testified that he understood from Respondent's representations that the 2006–2007 tax returns did in fact exist but had been misplaced.

After the August 2009 hearing, the court issued a written order directing Respondent to provide releases to the IRS for his 2006–2007 tax returns, produce his 2008 returns within seven days of completion, and certify that he had produced to the defendants all requested corporate documents.[85] In that order, the court also ruled:

> [Respondent] was not forthcoming at the June 25, 2009 hearing about the scope of work performed by his former accountant, Mark Lehrner, with knowledge that the Court's June 26, 2009 Order covered tax returns at least from 2001 to the present. That [Respondent] had no knowledge that Mr. Lehrner had not prepared any tax returns for him or his company since 2001 is not credible.[86]

After sending Respondent's signed releases to the IRS,[87] the defendants learned from the IRS that neither Respondent nor H & A had filed any tax returns in 2006 or 2007. The defendants then filed another motion for sanctions on October 29, 2009,[88] arguing that Respondent had misled the court regarding the existence of those tax returns,[89] and asking for an additional award of attorney's fees.

On December 3, 2009, the court found that Respondent had not complied with its order dated August 19, 2009. The court ruled Respondent had either "failed to provide material information to [the defendants] and to the Court regarding the existence of personal and corporate tax returns for the years 2006–2008 at hearings and in communications with counsel which would have avoided delay in [the defendants'] collection efforts" or "[a]t worst intentionally misled" the defendants and the court.[90] The court stated that Respondent's assertions during the hearings on June 25 and August 19, 2009, were in the nature of direct contempt, and the court set another contempt hearing for May 19, 2010.[91] The court again ordered Respondent to produce all documents and information previously requested by the defendants.[92]

Respondent testified that by late 2009 or early 2010 he finally located the box of missing tax documents and realized his returns had not been filed. He submitted the delinquent returns for the 2005–2008 periods on March 17, 2010, and he filed his 2009 returns on April 15, 2010.[93] According to Beecher, the defendants received copies of all of these returns by mid-April 2010.[94]

H & A's 2006 return shows gross receipts of over $310,000.00 and a net income of $142,000.00;[95] the 2007 return reflects $254,000.00 in gross receipts and $88,000.00 in net income;[96] and the 2008 return shows $169,000.00 in gross receipts and $50,000.00 in net income.[97] Also in April 2010, the defendants received H & A's 2006 profit and loss statements.[98] Beecher stated that these records certainly would have assisted him in collecting the judgment in 2008 because they contradicted Respondent's representations that he could not satisfy the debt.

---

85. Ex. 1.074; *see also* Ex. 16 at 0146:7–14; 0147:7–9. Respondent never filed this certification. He testified that he must have forgotten.

86. Ex. 1.074 at 0898–99. Although the Hearing Board considers as evidence Judge Wheeler's order and other orders of the trial court, we make our own factual findings and conclusions based upon the evidence before us.

87. Ex. E.

88. Ex. 1.081. Beecher testified that he filed this motion because his clients were "livid" and that he thought Respondent had given him "the runaround."

89. Ex. 1.081.

90. Ex. 1.086 at 1067.

91. Ex. 1.086. Respondent did not appear for that hearing, and the court had to reset the hearing for June 28, 2010. *See* Exs. 1.098 & 17.

92. Ex. 1.098.

93. Ex. 2.

94. *See* Exs. I & K.

95. Ex. 3.

96. Ex. 4.

97. Ex. 5.

98. Ex. 3 at 1538–49.

The defendants asked the court to assess additional attorney's fees and costs on April 5, 2010, based upon the court's findings concerning Respondent's misrepresentations regarding his tax returns and corporate records.[99] The court entered judgment against Respondent and H & A on June 14, 2010, in the amount of $61,265.12.[100] This sum represented the original judgment, plus costs, attorney's fees, and interest.[101] At the disciplinary hearing, Respondent defended his failure to make payments to the court registry by insisting that this order was not an order per se but rather merely a judgment.

More than a year later, on September 22, 2011, the defendants moved again for contempt against Respondent for his continual non-payment of the judgment entered April 14, 2008.[102] H & A's financial records indicate that between June 1, 2009, and March 7, 2012, H & A paid Respondent distributions of retained earnings in the amount of $137,107.00,[103] yet Respondent made no payments toward the judgment.

On November 21, 2011, the court ordered Respondent to submit a payment plan to satisfy the judgment and to make the first payment by December 2, 2011.[104] Respondent objected to the court's jurisdiction to enforce its judgment and failed to file any plan.[105] On December 24, 2011, the court rejected Respondent's jurisdictional argument and characterized Respondent as continually "uncooperative, evasive, and unwilling to disclose information and comply with [c]ourt's orders."[106] Respondent did not appeal this ruling. The court again directed Respondent to file a payment plan no later than January 9, 2012.[107]

The court eventually approved a payment plan of $500.00 per month.[108] Respondent made his July and August 2012 payments late.[109] At the hearing, Respondent provided uncontroverted testimony that he had made every subsequent payment on time with the exception of the June 2013 payment, which he had yet to make.

### False Statements to the Court Colo. RPC 3.3(a)(1) and 8.4(c)

The People contend that Respondent violated Colo. RPC 3.3(a)(1) and 8.4(c) by knowingly making false statements to the court, creating the misimpression that he had completed his 2006–2007 tax returns.[110] In defense, Respondent maintains he was truthful when he repeatedly told the court that the tax returns were in storage and that he was looking for them. Had he found the missing box and discovered that the returns had not been prepared, he claims he would have promptly completed them and then produced them to Beecher.

We cannot find that Respondent acted in contravention of Colo. RPC 3.3(a)(1), which prohibits lawyers from knowingly making false statements of material fact or law to a tribunal or failing to correct a false statement of material fact previously made to the tribunal. Comment 1 to Colo. RPC 3.3 provides that this rule is intended to govern the conduct of "a lawyer who is representing a client in the proceedings of a tribunal" or

99. Ex. 1.094.

100. Ex. 1.102.

101. Ex. 1.102.

102. Ex. 1.121.

103. Ex. 10 at 1661–64.

104. Ex. 1.125. On January 9, 2012, Respondent proposed a payment plan of $500.00 per month.

105. See Exs. 1.126 & 1.129.

106. Ex. 1.129 at 1288.

107. Ex. 1.129 at 1290.

108. Ex. 1.130; Ex. 1.147.

109. Compl. ¶ 105; Answer ¶ 105.

110. The People's claims encompass Respondent's statements about his tax returns from 2006 through 2008, but we determine the People have not proved that Respondent made any misrepresentations regarding his 2008 tax returns. We find that it was not clear which years were covered by the subpoena duces tecum issued on November 12, 2008, and there was no evidence showing Respondent was required to have filed his 2008 tax returns by November 25, 2008—the date the subpoena was returnable. Additionally, Respondent told the court at the hearing on August 19, 2009, that his 2008 tax returns had not been filed.

an ancillary proceeding.[111] Although not binding, this comment, like all comments, is meant to explain and illustrate the "meaning and purpose" of the rule and is intended as a guide to interpretation.[112] Although attorneys are required to adhere to the Rules of Professional Conduct when acting in a personal capacity, we determine that Colo. RPC 3.3 is limited in application to the conduct of an attorney who is representing a client.[113] Here, Respondent's conduct occurred in the course of C.R.C.P. 69 proceedings initiated against him and his firm, not against his clients. Since Respondent was representing his own interests, not those of any clients, he cannot be found to have violated Colo. RPC 3.3(a)(1).[114]

■ Instead comments to the Colorado Rules of Professional Conduct instruct us that misrepresentations made other than during the course of representing a client are best analyzed under Colo. RPC 8.4(c).[115] That rule proscribes conduct involving dishonesty, fraud, deceit, or misrepresentation.[116] To establish a violation of Colo. RPC 8.4(c), the People must prove that the lawyer acted knowingly or with a reckless state of mind.[117]

■ The evidence demonstrates that Respondent made several false statements at the contempt hearing on June 25, 2009. He told the court he could not produce the subpoenaed returns because they were in missing boxes, but in fact he did not file these returns until March 2010. Respondent then misled the court when he said that Lehrner, his accountant, prepared his tax returns, and he magnified this dishonesty by agreeing to execute a release allowing Lehrner to provide the 2006–2007 tax returns to the defendants. Although Lehrner had not prepared Respondent's taxes since 2001, Respondent's willingness to sign the release implied that the returns existed and that the defendants would indeed receive copies of them. Respondent's defense that the court did not specifically ask him whether Lehrner had filed his 2006–2007 taxes lacks merit. The hearing transcript makes clear that the court asked Respondent to name the accountant who had prepared his 2006 and 2007 tax returns, and Respondent identified Lehrner.

The evidence also shows that Respondent made similar false statements two months later at the hearing on August 19, 2009, when he told the court that he had personally prepared his 2006 and 2007 returns, which were in storage. He was also dishonest when he agreed to sign releases for the IRS, implying that the returns existed and could be retrieved. As evidenced by the court's orders requiring the IRS releases and pro-

111. The ABA adopted this comment in 2002. *See* Ellen J. Bennet et al., *Annotated Model Rules of Professional Conduct* 326 (ABA 7th ed.2011). Although the Colorado Supreme Court adopted comment 1 on April 12, 2007, effective January 1, 2008, not all jurisdictions have adopted this comment. *See id.*

112. Colo. RPC Scope ¶ 21.

113. Colo. RPC 3.3 cmts. 1–2; *see also Iowa Supreme Court Attorney Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 176–77 (Iowa 2013) (holding that an attorney who committed extrinsic fraud did not violate Iowa's analogue to Colo. RPC 3.3 because he engaged in fraud in his own dissolution proceeding, rather than while representing a client); *State ex rel. Okla. Bar Ass'n v. Dobbs*, 94 P.3d 31, 52 (Okla.2004) (holding that an attorney who made false representations to a court did not violate Okla. RPC 3.3 because "[t]hat rule addresses professional misconduct as an advocate for making false statements to a tribunal, not false statements by a lawyer as a witness").

114. *See* Black's Law Dictionary 271 (8th ed.2004) (defining client to mean "[a] person or entity that employs a professional for advice or help in that professional's line of work.").

115. *See* Colo. RPC 4.1 cmt. 1 ("For dishonest conduct generally see Rule 8.4"); *see also* Bennet et al., *supra* at 398 ("Misrepresentations made 'other than in the course of representing a client' are subject to Rule 8.4 rather than Rule 4.1.") (citations omitted).

116. Colo. RPC 8.4(c). Respondent will not receive any lesser sanction in light of our ruling that Colo. RPC 3.3 does not apply here, because we look to his underlying conduct rather than to the number of claims proved by the People in determining the appropriate sanction. *See In re Roose*, 69 P.3d 43, 49 (Colo.2003) (declining to consider multiple offenses as an aggravating factor when a respondent's offenses in fact "involved only two separate acts").

117. *In re Fisher*, 202 P.3d 1186, 1203 (Colo. 2009).

duction of the returns, as well as Judge Wheeler's testimony in the disciplinary hearing, Respondent's statements did in fact mislead the court. These misrepresentations are particularly troubling given Respondent's acknowledgement that as of April 2009, he himself was uncertain whether he had filed the returns. He never took any steps to correct his false statements or to correct the court's mistaken belief that the tax returns existed.

Further, the People have established that Respondent knew these statements were false when he made them. We find it incredible that Respondent did not know whether he had prepared and filed his 2006 and 2007 tax returns when he was asked about them in 2009—just two years after they presumably should have been filed. It is equally inconceivable that Respondent was unaware Lehrner had not prepared his taxes during the prior seven years, particularly given his acknowledgement that preparing and filing tax returns is a matter of great import. Thus, the Hearing Board finds that Respondent knew he had not filed his tax returns when he made these statements to the court.

We conclude that Respondent knowingly violated Colo. RPC 8.4(c) when, throughout the course of the collection proceedings, he made multiple misrepresentations to the court about the existence of his 2006 and 2007 tax returns.

### False Statements to the Defendants
### Colo. RPC 3.3(a)(3), 3.4(a), 4.1(a), and 8.4(c)

■ The People allege that Respondent violated Colo. RPC 3.3(a)(3), 3.4(a), 4.1(a), and 8.4(c) by falsely testifying at his deposition that he was unable to locate his 2006 tax returns and that he had received an extension to file his 2007 tax returns. Respondent, for his part, asserts his statements were truthful.

First, we reach the same conclusion concerning Colo. RPC 3.3(a)(3) as we did regarding Colo. RPC 3.3(a)(1) [118]—that Respondent did not violate this rule because he was rep-

resenting his own interests, rather than those of a client.[119] Likewise, we cannot find that Respondent violated Colo. RPC 4.1(a), which provides that "in the course of representing a client" a lawyer shall not knowingly make a false statement of material fact or law to a third person. The plain language of this rule expressly limits its application to situations where a lawyer is acting as an advocate. Comment 1 to Colo. RPC 4.1 also emphasizes that this rule applies when lawyers are "dealing with others on a client's behalf." Here, the evidence clearly shows Respondent made the misrepresentations while advocating for his own interests.

We do find, however, that Respondent's conduct forms the basis for a Colo. RPC 8.4(c) violation. Respondent knowingly made misrepresentations during his deposition on December 18, 2008, by asserting that his subpoenaed tax returns were in a missing box. He also explicitly told Beecher that he had claimed $60,000.00 of income on his 2006 tax returns. These statements were false. Respondent did not file the 2006–2007 returns until March 2010, and he did not claim $60,000.00 of income in 2006. We do not accept that Respondent was unaware these statements were false when he made them, especially given the short period of time that elapsed between the tax years in question and his deposition. Accordingly, we conclude that the People have proved a knowing violation of Colo. RPC 8.4(c).

■ Finally, the People assert that Respondent unlawfully obstructed the defendants' access to relevant evidence in violation of Colo. RPC 3.4(a) when he repeatedly told them that his "missing" 2006 and 2007 tax returns existed, took additional misleading actions such as signing releases, and stated at his deposition that no one owed him any money and that he possessed no attachable assets. Respondent denies this charge, asserting that he did not discover his returns were delinquent until he found the missing box, that the negligible amount of money in H & A's operating account when the writs

---

118. Colo. RPC 3.3(a)(3) prohibits an attorney from offering evidence that the attorney knows to be false.

119. *See* Colo. RPC 3.3 cmts. 1 & 2.

were served could not be attached, and that H & A only owed him retained earnings when it enjoyed a cash flow.

 Colo. RPC 3.4(a) states that a lawyer shall not "unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value." This rule carries with it no culpable mental state. Unlike Colo. RPC 3.3, the rule does not expressly state, nor do the comments instruct, that the rule applies only to an attorney's conduct while representing a client, and we decline to narrow its application here. Comment 1 to Colo. RPC 3.4 elucidates that improperly concealing evidence impedes fair competition in the adversary system. An attorney violates this provision by falsifying relevant evidence, failing to reveal relevant evidence in response to discovery requests, or making misleading statements concerning the location of key documents in a legal matter.[120]

The facts before us demonstrate that Respondent unlawfully obstructed the defendants' access to evidence of his financial status, including his tax returns and information about H & A's assets, by engaging in a series of dilatory tactics throughout the collection proceedings. Specifically, Respondent made false statements at his deposition about the existence of the relevant tax returns. In the same deposition, he failed to disclose that H & A still had a balance of $196,000.00 in retained earnings payable to him and that H

& A carried a small balance in its operating account. He later agreed to sign releases for Lehrner and for the IRS, which perpetuated the defendants' mistaken belief that they could obtain the returns. Accordingly, we determine that the People have proved Respondent violated Colo. RPC 3.4(a).

### Failure to Comply with Discovery Requests and Court Orders Colo. RPC 3.4(c) and 8.4(d)

 The People allege that Respondent knowingly failed to comply with discovery requests and court orders in contravention of Colo. RPC 3.4(c) and 8.4(d). To succeed on their Colo. RPC 3.4(c) claim, the People must demonstrate that Respondent knowingly disobeyed "an obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists." Although the rule does not define the term "open refusal," commentators suggest that such a refusal is premised on "good faith and open noncompliance in order to test an order's validity." [121]

The People contend that Respondent knowingly failed to follow the instructions of the H & A writ and knowingly failed to provide complete and accurate information in response to the interrogatories. They also argue that Respondent violated Colo. RPC 3.4(c) and 8.4(d) by ignoring the court's orders of May 22, 2009, and June 14, 2010, which directed him to pay the judgment of attorney's fees into the court registry.

120. *See In re Hugen*, 973 P.2d 1267, 1268 (Colo. 1999) (approving stipulation that an attorney violated Colo. RPC 3.4(a), among other rules, by falsifying bank records purporting to show that his trust account balance did not fall below $17,500.00 during the relevant time period); *Fla. Bar v. Hmielewski*, 702 So.2d 218, 219–20 (Fla. 1997) (finding that an attorney who made deliberate misrepresentations regarding the location of patient's medical records violated Fla. RPC 3.4(a), among other rules); *In re Bark*, 72 So.3d 853, 856 (La.2011) (finding that an attorney violated La. RPC 3.4(a), among other rules, by promising and then failing to provide written responses to disciplinary complaints and subpoenaed financial records); *Miss. Bar v. Land*, 653 So.2d 899, 909 (Miss.1994) (finding that an attorney violated Miss. RPC 3.4, among other rules, by purposely withholding information in response to interrogatories).

121. 2 Geoffrey C. Hazard Jr. & W. William Hodes, *The Law of Lawyering* § 30.9, at 30–21 (3d ed.2001, 2011 Supp.); *see Chapman v. Pacific Tel. & Tel.* Co., 613 F.2d 193, 197 (9th Cir. 1979) (finding that the proper course of action after a court denied a writ of prohibition was for the attorney to seek further review in the U.S. Supreme Court or comply with the court's order under protest, preserving the issue for a subsequent appeal); *In re Disciplinary Matter Involving Ford*, 128 P.3d 178, 181 (Alaska 2006) (finding that the proper course of action for an attorney who believed a court's order was invalid was to openly inform the court that he could not comply with the order); *Attorney Grievance Comm'n of Md. v. Levin*, 432 Md. 429, 69 A.3d 451, 463–64 (013) (finding that the proper course of action for an attorney who thought an order was invalid was to raise objections with the court).

Respondent, on the other hand, maintains that he provided sufficient answers to the interrogatories, that he complied with the H & A writ because he was owed no money was owed to him at the time it was served, and that he was unable to pay the judgment. Respondent also asserts that at no time in the collection proceedings did the court enter any order that provided a valid basis for remedial sanctions, that the court lacked jurisdiction over the defendants' collection efforts, and that the court made unsupportable findings and conclusions. We find that Respondent's defenses lack merit. Even if Respondent believed that the court's orders and findings were invalid, he was not free to ignore them. His proper remedy was to appeal those rulings. Absent a stay, Respondent was required to promptly comply with all orders pending appeal.[122]

Respondent was ordered by the court in November 2008 to supplement his interrogatory answers, which he did by stating that his income from H & A depended upon the settlement of large contingent cases. The People argue his response was false, since H & A paid him $950.00 between November 20, 2008, and December 5, 2008. Respondent testified that H & A would occasionally reimburse him for costs or pay him living expenses, which he did not consider income. Although the Hearing Board cautions that the better practice would have been for Respondent to have clearly explained that the $950.00 was a reimbursement rather than traditional income, we do not find that the People have proved that this response constitutes a knowing violation of Colo. RPC 3.4(c) under the clear and convincing evidence standard.

However, the H & A writ—a court order—imposed upon Respondent a series of obligations, including: describing the nature and amount of H & A's debts and obligations; holding assets that H & A owed to him; and claiming any exemption within ten days. Respondent answered the writ by stating H & A owed him "retained earnings" but did not indicate the amount of the debt, as required. Respondent did not claim as exempt from the writ the retained earnings or any other property, nor did he immediately secure the $800.00 balance of H & A's operating account, as he was obligated to do. Further, he did not file objections to the writ or otherwise assert that he had no valid obligation to comply with it.[123] By failing to honor the writ he violated Colo. RPC 3.4(c).[124]

Additionally, we find that Respondent violated the court's May 2009 and June 2010 orders directing him to pay attorney's fees into the registry. Respondent knew he was obligated to pay this judgment, yet he never appealed the orders, moved for reconsideration, or otherwise made a cognizable "assertion that no valid obligation exist[ed]."[125] Although Respondent may not have been able to pay the entire judgment, H & A's accounting records convince the Hearing Board that he could have paid part of the judgment. For example, after the court entered its judgment, H & A continued to distribute retained earnings to Respondent, reducing its obligation of retained earnings from $190,257.00 on June 1, 2009, to $53,150.00 on March 7, 2012. Instead of using this money to comply with the court's order, Respondent made a conscious choice to use these funds, which were under his control, for personal and business expenses.

122. See Charles Milne Assocs. v. Toponce, 770 P.2d 1313, 1318 (Colo.App.1988) ("An order issued by a court with jurisdiction over the subject matter and the person must be obeyed by the parties until it is reversed by orderly and proper proceedings.") (Citations omitted).

123. See, e.g., Attorney Grievance Comm'n of Md., 69 A.3d at 469–70 (finding that an attorney did not openly challenge the validity of a writ of garnishment served upon his client file a motion to quash, an answer challenging the nature of the assets to be attached, or another appropriate motion).

124. See, id. at 463–64 (finding that an attorney violated Md. RPC 3.4(c) by failing to honor a writ of garnishment served upon his client).

125. Colo. RPC 3.4(c); see also In re Disciplinary Matter Involving Ford, 128 P.3d at 181 (finding that an attorney did not openly refuse to comply with a court's order where the evidence showed the attorney knew he was disobeying a valid order yet did not challenge the order, seek a stay, or seek an expedited ruling from the appellate court).

Indeed, he made no effort to pay the judgment until mid–2012. Accordingly, we determine Respondent violated Colo. RPC 3.4(c).

 Finally, we determine that by disregarding the H & A writ and the court's orders to pay the judgment, Respondent violated Colo. RPC 8.4(d), which proscribes conduct that is prejudicial to the administration of justice. In addition, Respondent's conduct during the collection action caused unnecessary delay. He engaged in dilatory tactics for two years to avoid paying the judgment of attorney's fees by neglecting to inform the defendants and the court that he had filed interrogatory responses in person, failing to comply with the writ of garnishment, signing ineffectual releases for his "missing" tax returns with the knowledge that the defendants' efforts would be unsuccessful, and continuing to mislead the court and defendants about the existence of his tax returns. Through this conduct, Respondent prejudiced the administration of justice.[126]

## IV. SANCTIONS

 The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[127] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* By engaging in dishonest conduct and conduct prejudicial to the administration of justice, Respondent violated duties he owed to the legal system.[128]

*Mental State:* Respondent's state of mind can be characterized as knowing, defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective to accomplish a particular result." [129] Respondent knew he had not filed the subpoenaed tax returns but instead led both the court and the defendants to believe the returns existed. Likewise, Respondent knowingly failed to comply with the writ of garnishment and the court's orders to pay the award of attorney's fees.

*Injury:* Respondent's conduct in the collection proceedings forced the defendants to expend significant efforts to collect on the judgment. Further, Judge Wheeler testified that Respondent caused significant delay in the proceedings, which lasted over four years. He believes Respondent was not forthcoming and did not give the court sufficient information about his current or past income, further hindering the proceedings. The judgment entered against Respondent increased by over $30,000.00 during this period due to interest and additional awards of fees and costs. Only last year did Respondent submit a payment plan to satisfy the judgment, the bulk of which remains unpaid.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Suspension is the presumptive sanction under ABA *Standard* 6.12 when a lawyer knowingly submits false statements to the court or improperly withholds material information,

---

126. *See People v. Johnson*, 944 P.2d 524, 527 (Colo.1997) (finding an attorney's failure to pay an award of attorney's fees until two years after the judgment was prejudicial to the administration of justice); *People v. Murray*, 887 P.2d 1016, 1020 (Colo.1994) (finding an attorney's conduct violated Colo. RPC 8.4(d) when he caused a court to delay resolution of a matter); *In re Stover*, 278 Kan. 835, 104 P.3d 394, 399 (2005) (finding an attorney violated Kan. RPC 8.4(d) by failing to comply with court orders).

127. *See In re Roose*, 69 P.3d at 46–47.

128. *See* ABA *Standard* 6.0. Although Appendix 1 to the ABA *Standards* suggests that violations of Colo. RPC 8.4(c) represent a breach of a duty owed to the public or to clients under ABA *Standards* 4.6 and 5.1, we find Respondent's misconduct here is more properly considered as a breach of his duty to the legal system under ABA *Standard* 6.0, as it involves misrepresentations directed toward the court and opposing counsel.

129. ABA *Standards* § III at 9.

yet the lawyer takes no remedial action, thereby causing an adverse or potentially adverse effect on a legal proceeding. Likewise, ABA *Standard* 6.22 calls for suspension when a lawyer knowingly violates a court order or rule, leading to interference or potential interference with a legal proceeding.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

■ Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may justify a reduction in the severity of the sanction.[130] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.[131]

*Dishonest or Selfish Motive—9.22(b):* We find that Respondent's misconduct reflects an attempt to delay the proceedings and avoid collection of the judgment, and we therefore apply this factor in aggravation.

*Pattern of Misconduct—9.22(c):* Respondent's disciplinary history—a public censure in 2010 and a private admonition in 2011—establishes that he violated Rules of Professional Conduct during the same general timeframe as his misconduct in this case, demonstrating a pattern of misconduct.[132] Additionally, we find that Respondent persisted in his duplicity over a period of two years in the collection proceedings. Thus, we heavily weigh this factor in aggravation.

*Multiple Offenses—9.22(d):* Respondent engaged in multiple offenses; he made several misrepresentations about the existence of his tax returns over a two-year period, failed to comply with more than one court order, and engaged in obfuscatory tactics.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* We find that Respondent has refused to recognize the wrongful nature of his misconduct. Although he admitted he may have "overstated" what was in the missing box, he was unwilling to acknowledge that he was dishonest.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was admitted to the bar in 1972. The misconduct at issue here does not reflect well on such a long-standing practitioner.

*Character or Reputation—9.32(g):* Respondent testified to his commitment to serving the Colorado legal community. He noted that he was a founding member thirty-five years ago of the Colorado Lawyers Committee, an organization that provides pro bono legal services, and has served as a chairperson for a number of bar committees and performs significant pro bono work. He also stated that he has worked closely with members of the General Assembly on legislative matters important to him. We consider Respondent's efforts to improve the profession and the community as a whole as evidence of his good character. And we deem his selection as certified class counsel for a large Racketeer Influenced and Corrupt Organizations Act case currently pending in federal district court as evidence of his reputation in the legal community.

### Analysis Under ABA *Standards* and Colorado Case Law

We are aware of the Colorado Supreme Court's directive to exercise our discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[133] and we acknowledge that "individual circumstances make extremely problematic any meaningful

---

130. *See* ABA *Standards* 9.21 & 9.31.

131. Respondent did not advocate for the consideration of specific mitigating factors at the disciplinary hearing or in a pre-hearing brief.

132. *See People v. Sather,* 936 P.2d 576, 579 (Colo. 1997) (accepting a conditional admission of misconduct and stating that a letter of admonition issued the previous year was "evidence of a pattern of misconduct" under ABA *Standard* 9.22(c) because it "concern[ed] events apparently occurring during the same time period as in this

case"); *In re Reardon,* 759 A.2d 568, 577 (Del. 2000) ("A pattern may be discerned from two or more recognizably consistent acts that serve as a predictor of future misconduct.").

133. *See In re Attorney F.,* 285 P.3d 322, 327 (Colo.2012); *In re Fischer,* 89 P.3d 817, 822 (Colo.2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

comparison of discipline ultimately imposed in different cases." [134] Although prior cases are helpful by way of analogy, a hearing board should determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The Colorado Supreme Court has imposed lengthy suspensions in other prior disciplinary cases involving misrepresentations and false testimony under oath. For example, in *People v. Kolbjornsen,* a lawyer who made a false statement of material fact under oath to a tribunal and who also falsified evidence was suspended for one year and one day.[135] In *People v. Koller,* a lawyer was suspended for one year and one day for fraudulently conveying real property to hinder, delay, or defraud creditors where just one aggravating factor and one mitigating factor applied.[136] Likewise, in *People v. Reed,* the Colorado Supreme Court found suspension for one year and one day appropriate where an attorney failed to disclose to judgment creditors that he had received substantial sums of money from his law firm and improperly transferred his ownership interest in the firm, among other misconduct.[137] In contrast, the Colorado Supreme Court imposed just a three-month suspension in *People v. Rader,* where a lawyer recklessly made multiple misrepresentations to bank officials regarding a business but the lawyer lacked actual knowledge of the business's deceptive practices.[138]

In this case, Respondent's repeated deceitful misconduct tarnished the legal profession and thus warrants a suspension. Respondent's knowing misconduct is readily distinguishable from *People v. Rader,* where the attorney received a short suspension for making reckless misstatements. Here, Respondent knowingly testified falsely under oath and made multiple misrepresentations over the course of two years, which the court and opposing counsel relied upon. Further, the numerous aggravating factors decidedly outweigh the sole mitigating factor. Accordingly, we conclude a suspension for one year and one day is the appropriate sanction, mindful that "[l]awyers serve our system of justice, and if lawyers are dishonest, then there is a perception that the legal system, too, must be dishonest." [139]

## V. CONCLUSION

 Respondent knowingly made misrepresentations to the court and to opposing counsel, causing substantial confusion and delay, and he failed to abide by court orders. In light of the multiple aggravating factors and scarcity of mitigating factors here, the appropriate sanction is suspension for one year and one day.

## VI. ORDER

The Hearing Board therefore ORDERS:

134. *In re Attorney F.,* 285 P.3d at 327; *People v. Rosen,* 198 P.3d 116, 121 (Colo.2008).

135. 917 P.2d 277, 279 (Colo.1996) ("Testifying falsely under oath to a tribunal is an extremely serious ethical violation, and raises substantial questions about a lawyer's fitness to continue to practice law."). In *Kolbjornsen,* the absence of mitigating factors and the multiple aggravating factors, including providing false testimony at the disciplinary hearing, warranted a severe sanction. *Id.* As in *Kolbjornsen,* we find that Respondent made a false statement of material fact; the existence of Respondent's subpoenaed tax returns was a material fact to the C.R.C.P. 69 proceedings, since the purpose of the proceedings was to determine what property was available to satisfy a judgment. Unlike *Kolbjornsen,* however, the instant case post-dates the 2008 amendment to the Colo. RPC 3.3 comments, which instruct that the rule only applies in situations involving client representation. Thus, our reliance on *Kolbjornsen* is limited to our analysis

of the appropriate sanction for Respondent's misconduct.

136. 873 P.2d 761, 763 (Colo.1994).

137. 942 P.2d 1204, 1206 (Colo.1997); *see also People v. Kearns,* 843 P.2d 1, 5 (Colo.1992) (upholding a suspension for one year and one day where the attorney made misrepresentations to obtain a loan and then assigned a promissory note secured with loan's proceeds without the lender's knowledge); *People v. Phelps,* 837 P.2d 755, 759 (Colo.1992) (suspending an attorney for one year and one day for violating the equity skimming statute, a criminal offense, where three aggravating factors and one mitigating factor were present).

138. 822 P.2d 950, 954 (Colo.1992).

139. *People v. Pautler,* 47 P.3d 1175, 1179 (Colo. 2002).

1. **JOHN FREDERIC HEAD,** attorney registration number 03077, is **SUSPENDED FOR ONE YEAR AND ONE DAY.** The **SUSPENSION SHALL** take effect only upon issuance of an "Order and Notice of Suspension." [140]

2. Respondent **SHALL** file with the Court, within fourteen days of the effective date of the suspension, an affidavit complying with C.R.C.P. 251.28(d).

3. Should he wish to be reinstated to the practice of law, Respondent must seek reinstatement pursuant to C.R.C.P. 251.29(c).

4. The parties **SHALL** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before Wednesday, August 21, 2013.** No extensions of time will be granted. If a party files a post-hearing motion or an application for stay pending appeal, any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

5. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fourteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than fourteen days thereafter.

Hearing Board Member STEVEN L. TERRY, dissenting in part:

I join with the majority's determination that Respondent violated Colo. RPC 3.4(a), 3.4(c), 8.4(c), and 8.4(d), but I dissent from the majority's determination of Respondent's mental state with respect to Colo. RPC 8.4(c). I conclude that Respondent made misrepresentations to the court and to opposing counsel about the existence of his 2006 and 2007 tax returns with reckless disregard as to their truth or falsity rather than with actual knowledge of their falsity. For these reasons, I believe a suspension for four months, all stayed upon the successful completion of an eighteen-month period of probation, with conditions, is the appropriate sanction. [141] In my view, probation is fitting here because I find it unlikely that Respondent would harm the public. [142]

---

**140.** In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

**141.** *See People v. Rader,* 822 P.2d 950, 954 (Colo. 1992) (suspending an attorney for three months where the attorney recklessly made multiple misrepresentations to bank officials).

